UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:19-cr-00019-MMD-CBC |
| Plaintiff, | ORDER |
| v. | |
| JACOB ALEXANDER WOODS, | |
| Defendant. | |

**I.　SUMMARY**

Defendant Jacob Alexander Woods, who is an individual with a felony record, moves to suppress a gun that detectives obtained from him. Woods contend that the gun was recovered after he was seized without reasonable suspicion and arrested—de facto—without probable cause in violation of the Fourth Amendment to the United States Constitution ("Motion"). (ECF No. 21.)[1] The Court held an evidentiary hearing on August 6, 2019 ("Hearing"), and considers the arguments raised and exhibits admitted therein. The Court finds no constitutional violation and will therefore deny the Motion.

**II.　FACTUAL FINDINGS[2]**

The Court relies on evidence attached to the parties' briefs, as well as the testimony presented at the Hearing, to make its findings of fact. The Court points out any

///

///

---

[1]The Motion also sought to suppress purported "unmirandized" or "unrecorded statements" by Woods. (ECF No. 21 at 7–8.) However, the government represents that Woods was not asked any questions related to the facts underlying the case and the government has "no intention of using any statements about the [D]efendant cooperating with law enforcement at trial." (ECF No. 26 at 10.)

[2]Fed. R. Crim. P. 12(d) provides: "Where factual issues are involved in determining a motion, the court must state its essential findings on the record."

inconsistencies between the evidence before the Court where such inconsistencies are material to the Court's findings of fact.

Several minutes before 4 p.m. on February 20, 2019, Scott Rasmussen, a Reno Police Department detective who is assigned to the Regional Crime Suppression Unit ("RCSU"), received information from a source of information ("SOI"). (ECF No. 26-1; Defendant (Def.)'s Exh. 505.) The SOI informed Rasmussen by text that "The man you are looking for is in 309 wonder lodge [SOI's identifier missing]."[3] (ECF No. 26-1 at 2.) Rasmussen responded, stating "Who is that[?]." (*Id.*) In turn, the SOI stated "2gun zilla real name Jacob felon with firearm [SOI's identifier missing]." (*Id.*) Rasmussen indicated that he was on his way to the Wonder Lodge and asked what the individual was wearing. (*Id.*) The SOI explained that the individual was staying "in that room [309] now [SOI's identifier missing]" and that he would "have to go down thier (sic) to find out what he is wearing now [SOI's identifier missing]." (*Id.* at 3.) Rasmussen reported that he was two minutes away and told the SOI that "If [the individual] leaves he will be stopped so hopefully he has the gun with him." (*Id.*) Relevantly, the SOI informed that "He has [the gun] on him at all times he doesn't leave without it cause he doesn't trust the people who share the room with him [SOI's identifier missing]." (*Id.* at 3–4.) The SOI subsequently provided that he was leaving his location and later informed that "He is thier (sic) 6'4 black man thin build tattoos on face in his early 40s [SOI's identifier missing]" and stated "On the way [SOI's identifier missing]." (*Id.* at 4–5.)

Shortly after 7 p.m. the same day, the SOI informed Rasmussen that the identified individual "is wearing grey jeans and a black top and is jumping from [room] 309 to 310 all the time he is in 310 now [SOI's identifier missing]." (*Id.* at 5–6.) Rasmussen later told the SOI ". . . I've seen a dude in red bouncing back and forth. He planning on leaving at all

///
///

---

[3]The government's counsel represented at the Hearing that only the SOI's identifying information was redacted from the SOI's messages. The Court reviewed one such message and found in accordance with counsel's representation.

2

[?]" (*Id.* at 7.) The SOI responded "Not sure he is in 310 now do you see what room I'm in [SOI's identifier missing]." (*Id.*) Rasmussen confirmed "Yes I know the rooms." (*Id.*)

A text from Rasmussen to the SOI states that he left the Wonder Lodge after he had been "there for 6 hours." (*Id.* at 8.) However, during the Hearing Rasmussen revealed that he actually surveilled the Wonder Lodge for between roughly 45 minutes and 1.5 hours. He stated that he told the SOI otherwise because he wanted to provide the SOI with assurance that he was taking the tip seriously and did not give the exact surveilling timeframe for officer safety reasons.

The next day, February 21, at 4:23 p.m., the SOI sent Rasmussen a text message providing that the individual was in room "309 right now." (*Id.* at 9.) Rasmussen responded "On my way." Then he texted "What's he wearing" and "I'm here." (*Id.*)

A text exchange several minutes before 6 p.m. the same day between Rasmussen and another detective, Dustin Butler, shows that Butler verified information about "Jacob/chance," and Rasmussen informed that the individual was in his "40's tattoos on face." (ECF No. 26-3 at 3.) At the Hearing, Butler testified that Rasmussen provided the identifying details in a prior phone conversation before the text exchange. In the latter exchange, Rasmussen also confirmed that the individual was "[s]uper tall" and provided he is 64(sic) ish." (*Id.*) Butler then sent Rasmussen a picture to which Rasmussen responded "That's my dude here for sure Yesssss." (*Id.*) Butler responded "Copy I'll run him." (*Id.*) Butler ran an inquiry on Jacob Woods in the NCIC Interstate Identification Index ("NCIC Index") at 6:01 p.m. (reflected as 18:01:23) the same day. (ECF No. 26-4 at 2.) The inquiry returned with Woods' identifying information, including his tattoos and that he had prior felony convictions. (*Id.* at 2–6.)

At about 7:45 p.m. that day, Rasmussen observed Woods exit room 309. (Def.'s Exhs. 505, 506.) Rasmussen's police report notes that Woods walked southbound on Lake Street and jaywalked as he crossed the street. (*Id.*) At the Hearing, Rasmussen said he did not have a visual on Woods after he exited the Wonder Lodge, but other detectives on surveillance reported what they had observed.

3

Rasmussen and Butler's police reports[4] provide that detectives assigned to RCSU approached Woods, wearing full raid gear with "Police" markings on front and back and identified themselves as police. (Def.'s Exhs. 505, 506.) This happened after Woods had exited a nearby convenience store located across from the Wonder Lodge ("the Store"). Woods fled as he saw detectives approaching him. (*Id.*) Detectives chased after Woods on foot, followed by police vehicles. (Def.'s Exh. 505.) It was snowing that day, and the detectives pursuing Woods fell. (Def.'s Exh. 506.) Woods also fell. (*Id.*)

The testimony of multiple detectives at the Hearing provide more details but generally track the narratives in Rasmussen and Butler's police reports. Detective Bryon Cragg testified that he chased after Woods and Butler testified that he followed suit, and they headed west on Fourth Street and then turned right to head north on Lake Street.[5] Woods turned right onto the driveway of the Store where he encountered another detective, Jacob Kincaid. According to Kincaid, he had returned to park at the Store after responding to another incident when he heard on the radio that a "foot pursuit" was occurring. As a result, Kincaid got out of his marked vehicle and rounded the corner of the Store on the driveway leading to the Store's parking lot from Lake Street where he saw Woods. Cragg testified that he fell and grabbed onto Kincaid. Kincaid testified that he had reached out to grab Woods' sleeve but was not able to before he fell and Woods fell at about the same time.

Woods also testified at the Hearing. While Woods' testimony was hard to follow, he materially testified as follows. He exited the Wonder Lodge on two separate occasions. The second time he accompanied his female companion because threatening messages directed at him and her were being sent to her phone. Woods had bought the phone from

///

---

[4] Woods' Exh. 506 is labeled as Detective Byron Cragg's Report. However, it appears Cragg's report is only on the first page. The other pages consist of Butler's narrative report, which the Court references herein.

[5] The detectives and Woods offered competing testimony as to whether Woods crossed into Fourth Street after he exited the Store, thus committing jaywalking. The Court determines this dispute is immaterial to its determination.

4

another individual only a few days prior. Based on his observations while in the parking lot of the Store he deduced the presence of undercover officers. On his second visit to the Store, he exited and one of the undercover detective's unmarked truck was sticking out into the sidewalk curb and he had to walk around it. Woods saw another detective exit a different unmarked vehicle with clothing identifying himself as police. Woods testified that he ultimately decided to run from detectives because he concluded that he had been set up, he knew he had a gun on him, and did not want to return to prison.

Woods testified that one detective—who was not pursuing him from behind—tackled him. Although dazed he tried to run away and decided to push the gun that he was carrying away from himself. He stated that the weapon slid on the snow and struck a detective.

Rasmussen and Butler's police reports indicate that after Woods fell, Woods retrieved a firearm from his jacket pocket (Def.s' Exhs. 505, 506). Woods testified that the gun was in his waistband. Butler reported that he was almost on top of Woods as Woods turned swinging his arm towards Butler and ultimately struck Butler in the "shins" with the gun. (Def.'s Exh. 506.) As a result, the gun fell to the ground and Woods was seized and taken into custody. (*Id.*)

A grand jury indicted Woods for one count of felon in possession of ammunition in violation of Title 18, United States Code §§ 922(g)(1) and 924(a)(2). (ECF Nos. 12, 14.) The indictment also seeks forfeiture of the firearm or ammunition if Woods is convicted. (ECF No. 12 at 2.)

### III. FOURTH AMENDMENT LEGAL FRAMEWORK

#### A. Reasonable Suspicion

"The reasonable-suspicion standard is not a particularly high threshold to reach." *U.S. v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). "Although . . . a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (quoting *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002)).

"Reasonable suspicion is a 'commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

In making a reasonable-suspicion determination, courts look at the totality of the circumstances of each case "to see whether the detaining officer has particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (internal quotations and citation omitted). A court "may conclude that 'some factors in a particular case are more probative than others,' but this evaluation cannot be done in the abstract by divorcing factors from their context in the stop at issue." *United States v. Cotterman*, 709 F.3d 952, 970 (9th Cir. 2013) (en banc) (quoting *Arvizu*, 534 U.S. at 277). "'Each case must turn on the totality of the particular circumstances' in that case." *Id.* (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 885 n.10 (1975)).

"A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Moreover, the totality of the circumstances includes "both the content of the information possessed by police and its degree of reliability." *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

**B.     Seizure**

The Fourth Amendment prohibits unreasonable seizures. "For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (citation omitted). "A police officer has restrained the liberty of the citizen if, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* (internal quotations and citations omitted).

///

However, absent physical force, a seizure occurs where "an officer's show of authority [is] accompanied by '*submission* to the assertion of authority'." *U.S. v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011) (quoting *California v. Hodari D.,* 499 U.S. 621, 626 (1991)). "[A] seizure does not occur where the subject does not yield." *Id.*; *see also Hodari D.*, 499 U.S. at 629 (finding the suspect "was not seized until he was tackled").

## IV. DISCUSSION

The Court's analysis is chiefly driven by the information that police officers possessed before seizing Woods—from both the SOI and NCIC Index—and its degree of reliability, as well as Woods' head-long flight from police.

The parties' arguments were cumulatively provided in their briefs (ECF Nos. 21, 26, 27) and at the Hearing. Woods essentially argues that his seizure was not based on reasonable suspicion because the SOI is tantamount to an unidentified tipster. Woods further contends that the SOI's information was largely tantamount to public knowledge and not reliable due to lack of information about the SOI, the SOI's motivations, and the SOI's basis of information about Woods and the gun. Woods argues that detectives needed more corroborative indicia about Woods' possession of the gun for the SOI's statement that Woods had the gun with him "at all times" to be reliable. Finally, Woods appears to contend that his flight from officers was provoked by the setting under which he was surveilled while at the convenience store.[6]

///

///

---

[6] At the Hearing Woods' counsel argued that the seizure occurred when Woods observed a marked police truck had activated its light. According to Woods, this occurred when he approached the Store. But Woods then went inside the store with his female companion to make a purchase. He exited the Store and had to walk around another parked vehicle when the occupant of that vehicle Cragg—yelled for him to stop. Woods did not, and instead took off running despite knowing that a police officer commanded him to stop. Because Woods did not yield when the marked police truck activated its lights or even after a police officer commanded him to stop, the Court rejects Woods' argument that seizure occurred before the foot pursuit. *See Smith*, 633 F.3d at 893; *Hodari D.*, 499 U.S. at 629. In fact, the Court finds that Woods was not seized until either after he fell surrounded by detectives or was tackled by detectives following his flight.

In turn, the government chiefly argues that reasonable suspicion exists here because detectives independently corroborated the information the SOI provided, detectives approached Woods only after Woods jaywalked, Woods undertook flight away from detectives in a high crime area[7] after detectives had identified themselves, and Woods was not seized until after the pursuit ended with Woods' gun striking Butler.

The Court need not decide whether Woods jaywalked because the Court otherwise agrees with the government that Woods' seizure was supported by reasonable suspicion.

First, the Court concludes that, in totality of the circumstances, the SOI's information as corroborated by detectives was sufficient to support the more than a mere hunch—but short of probable cause and preponderance of the evidence—standard that is required to support a finding of reasonable suspicion. As pertinent to the facts of this case, an informant's tip may be considered as part of the totality of the circumstances. *U.S. v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006). The degree of information required to "to establish the requisite quantum of suspicion" differs depending on whether a tip has a low or high degree of reliability. *Id.* An informant's tip is considered more reliable where (1) the informant is known—as opposed to anonymous,(2) the informant has a proven track record of reliability, (3) the informant reveals his "basis of knowledge for the tip—how the informant came to know the information." *Id.* at 907–08 (citations omitted). But even where a tip comes from an anonymous source, the information in the tip may be considered reliable if the tip "provides detailed predictive information about future events that is corroborated by police observation." *Id.* at 908 (citations omitted). "Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than

///

///

---

[7]It is undisputed that detectives consider the area in which Woods was seized a high crime area. However, testimony supports that the detectives were not subjectively concerned with this fact.

8

if it relates to innocent activities." *Id.* (citing *White,* 496 U.S. at 332 & *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

Here, Rasmussen testified that he had contact with the SOI, albeit for only about a week or two, concerning unrelated matters, prior to following up on the information the SOI provided in this case. As to this case, the SOI provided Rasmussen with information—including predictive information—about Woods that was independently corroborated to support reasonable suspicion.[8] That information includes Woods' presence in room 309 of the Wonder Lodge, that Woods is a tall-black-man of thin build, has tattoo(s) on his face and was an ex-felony-offender. The text messages between the SOI and Rasmussen strongly supports a conclusion that the SOI was personally familiar with Woods and the latter's whereabouts.[9] This gives credence to the SOI's basis of knowledge. Pertinently, the SOI indicated that he knew Woods had the gun "at all times" *because* Woods did not trust the persons with whom he shared a room. To be clear, Rasmussen did not seize Woods based solely on the information from the SOI. Rasmussen surveilled the apartment where the SOI reported Woods was located on February 20 and then returned the next day to continue the surveillance.[10]

///

---

[8] Given the detectives' independent corroboration, Woods' argument that Rasmussen lacked knowledge of the SOI's history—criminal and otherwise, reliability, motive, etc., is immaterial for the purpose of meeting the threshold of reasonable suspicion.

[9] Woods' counsel argued at the Hearing that the information from the SOI as to Woods' whereabouts and his physical built and appearances is available to any observer who cares to notice and is not revealing. However, this information is considered in context and coupled with the text from the SOI as to why Woods would have a gun on him "at all times." Cumulatively, this information shows that the SOI had some level of access and proximity to Woods to render the information reliable.

[10] Woods posits that detectives acted in accordance with Rasmussen's statement on February 20, 2019, that if Woods left the Wonder Lodge "he will be stopped so hopefully he has the gun with him" (ECF No. 26-1 at 3). However, this statement does not undermine that detectives had the requisite reasonable suspicion to seize Woods. Furthermore, Rasmussen testified that he would not have seized Woods until he had corroborated material information received from the SOI. And, it is undisputed that Woods was not seized until the following day—after such corroboration via surveillance and criminal history check. Accordingly, Woods' position does not meaningfully impact the Court's analysis.

Woods' criminal history—as confirmed by Rasmussen and Butler—further adds to the layer of information bolstering reasonable suspicion of criminal activity under the circumstances here. Detectives may consider such criminal history in their reasonable suspicion calculus, albeit criminal history alone cannot establish reasonable suspicion. *See Cotterman*, 709 F.3d at 968; *see also United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) ("[C]riminal history contributes powerfully to the reasonable suspicion calculus."). As noted, Rasmussen had Butler inquire into Woods' criminal history to corroborate the information from the SOI. Butler retrieved information about Woods' criminal history confirming that Woods is an ex-felony offender with tattoos on his face, among other things.

Moreover, whether reasonable suspicion exists is a commonsense analysis that cannot be divorced from reality. Thus, while at the Hearing Woods sought to undermine the SOI's information that Woods had the gun on him "at all times," whether officers independently observed indicators that Woods actually possessed the gun is largely irrelevant given the other available facts.

Notably, after detectives identified themselves as police on February 21, Woods took off in headlong flight away from the detectives. "[A] person's 'headlong,' '*unprovoked*' flight upon seeing a police officer, when it occurs in a high-crime neighborhood, is sufficient to establish reasonable suspicion that the person is involved in criminal activity." *Smith*, 633 F.3d at 893 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (emphasis added)). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 894 (internal quotations and citation omitted). At the least, the detectives had more than reasonable suspicion to conclude that Woods was in possession of the gun when Woods fled from detectives. It was reasonable for detectives to conclude that Woods' flight was suggestive of wrongdoing given that the SOI had indicated that Woods would be carrying

///

///

a gun and officers knew that Woods had been convicted of multiple felony offenses.[11] Based on these facts and the applicable law cited above, the Court finds that Woods' seizure was based on reasonable suspicion.

The Court further concludes that the instantaneous discovery of the gun Woods carried and his contemporaneous detention and arrest leave Woods' Motion devoid of a showing that his constitutional rights were violated. This is to say that the Court is unpersuaded by Woods' contention that tactics the detectives used resulted in an unlawful de facto detention and arrest and therefore the gun and ammunition recovered at the scene must be suppressed. (*E.g.*, ECF No. 21 at 5–6.) In light of all the circumstances, including detectives' knowledge of Woods' felony conviction, it is merely a matter of commonsense that detectives would detain Woods after he fled from them and a gun was immediately recovered. These same circumstances support Woods' ultimate arrest. The Court therefore denies the Motion.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that Woods' motion to suppress (ECF No. 21) is denied.

DATED THIS 19th day of August 2019.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[11] While Woods attempts to draw comparisons between this case and the Ninth Circuit's recent decision in *United States v. Brown*, (ECF No. 27 at 2, 7–10), *Brown* is materially inapposite. *See* 925 F.3d 1150 (9th Cir. 2019). In *Brown*, the circuit court concluded that "[t]he combination of almost no suspicion from the tip [of an anonymous tipster who reported materially nothing more than a young, black man with a gun—a presumptively lawful activity in the relevant state] and [the defendant's] flight does not equal reasonable suspicion." *Id.* at 1153–54. Here, we have a much higher degree of suspicion than in *Brown* and presumptively *unlawful* activity—an ex-felony offender in possession of a firearm.